# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Case Nos. 10-14788 and 10-14795 |
|  | ) |
|  | ) Chapter 11 |
| PPM TECHNOLOGIES HOLDINGS, INC. | ) |
| d/b/a PPM Global Corporation, *et al.* | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) Hon. Jack B. Schmetterer |
|  | ) |

## FINAL ORDER AUTHORIZING (A) SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364(c) AND (d); (B) GRANTING SECURITY INTERESTS, SUPERPRIORITY CLAIMS AND ADEQUATE PROTECTION; AND (C) USE OF CASH COLLATERAL

Upon the emergency motion (the "Motion") dated April 26, 2010, of PPM Technologies

Holdings, Inc. ("Holdings") and PPM Technologies, Inc. ("PPM"), supported by the Affidavit of

John L. Palmer in Support of the Emergency Motions, sworn to April 27, 2010, and filed on

April 29, 2010 [Docket No. 84] (the "Palmer Affidavit"), the above-captioned debtors, each in

their capacity as Debtors in possession (collectively, the "Debtors"), (a) requesting entry of an

order authorizing the Debtors pursuant to Sections 363(c), 364(c) and 364(d) of Title 11 of the

United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules

2002, 4001(c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Local Rule 4001-2, inter alia, (i) to obtain post-petition financing (the "Post-Petition

Financing") pursuant to the terms of the DIP Loan Documents (as defined below) from Valens

U.S. SPV I, LLC ("Valens U.S.") and/or the successors, participants and assigns of and with

Valens U.S. (all of which shall hereinafter collectively be referred to as, the "DIP Lender"),[1] (ii)

---

[1] Calliope Capital Corporation ("Calliope"), Valens Offshore SPV I, Ltd. ("Valens Offshore I"), Valens Offshore SPV II Corp. ("Valens Offshore II") and Valens U.S. are affiliates of the Debtors' predecessor pre-petition senior secured lender, Laurus Master Fund Ltd. (In Liquidation) ("Laurus"), and are assignees of Laurus with (continued...)

to grant the DIP Lender, pursuant to Bankruptcy Code §§ 364(c) and 364(d), first priority and

junior security interests in all of the Debtors' currently owned and after-acquired property to

secure the Debtors' obligations under the Post-Petition Financing; and (iii) to grant the DIP

Lender priority in payment with respect to the obligations incurred in connection with the Post-

Petition Financing over any and all administrative expenses of the kinds specified in Bankruptcy

Code §§ 503(b) and 507(b), other than as described below; (b) seeking this Court's authorization

to use the Pre-Petition Lenders' cash collateral within the meaning of Bankruptcy Code § 363(a)

(the "Cash Collateral"), pursuant to Bankruptcy Code § 363(c) and to provide adequate

protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d); (c) seeking a preliminary

hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant

to Bankruptcy Rule 4001 authorizing the Debtors to borrow under the Post-Petition Financing

the amounts set forth in and limited by the Approved Budget (as defined below) upon the terms

and conditions set forth in an interim order pending a final hearing; and (d) requesting that a final

hearing be scheduled by this Court to consider entry of a final order authorizing on a final basis,

inter alia, the Post-Petition Financing and use of the Cash Collateral; and due and sufficient

notice of the Motion under the circumstances having been given; and, on April 29 and 30, 2010,

the Preliminary Hearing on the Motion having been held before this Court in accordance with

Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, at the conclusion of which the Court

approved the Motion on an interim basis and thereafter signed that certain *Interim Order*

*(I) Authorizing (A) Secured Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and*

---

(...continued)

respect to the Pre-Petition Loan Documents (as defined below). The foregoing entities, collectively, and together
with each of Laurus' affiliates, successors, agents or assignees to whom Laurus has assigned or may assign certain
or all of its rights, shall be hereinafter collectively referred to as the "Pre-Petition Lenders".

*364(c) and (d); (B) Granting Security Interests, Superpriority Claims, and Adequate Protection,
and (C) Use of Cash Collateral, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy
Rule 4001(c)* (the "Interim Order"), which Interim Order was entered on the docket on April 30,
2010 [Docket No. 92]; and the Court having considered the Motion, and upon the entire record
of the Chapter 11 Cases (as defined herein), including without limitation, the record made at the
Preliminary Hearing and at the final hearing set pursuant to the Interim Order and held May 21,
2010 (the "Final Hearing"); and with all findings set forth herein to also constitute
acknowledgements, admissions, stipulations and representations by the Debtors, including
acknowledgements, admissions, stipulations and representations by the Debtors (the "Debtor
Stipulations"), which Debtor Stipulations remain subject to paragraph 24 of this Order, and this
Court having found good and sufficient cause appearing therefor;

IT IS HEREBY FOUND:

A.      On April 3, 2010 (the "Petition Date"), each of the Debtors filed voluntary
petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11
Cases"). Each of the Debtors is continuing in possession of its property, and operating and
managing its business, as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy
Code.

B.      On April 21, 2010, the Court entered an Interim Order Confirming the
Appointment of Mr. John L. Palmer as the Debtors' Chief Restructuring Officer and
Implementing Relief Related Thereto (the "CRO Appointment Order") [Docket No. 47],
pursuant to which Mr. Palmer's pre-petition appointment as Chief Restructuring Officer (the
"CRO") for each of the Debtors was confirmed. On May 14, 2010, the Court entered the Final
Order Pursuant to Bankruptcy Code Section 363(c) and Bankruptcy Rule 9019 (A) Confirming

3

the Employment of Mr. John L. Palmer as the Debtors' Chief Restructuring Officer and the

Removal of Leroy Wright and (B) Confirming the Release of Certain Claims Held by Debtors

[Docket No. 144], pursuant to which, among other things, the CRO Appointment became final

(the "Final CRO Appointment Order").

      C.      On May 10, 2010, an official committee of unsecured creditors (the "Committee")

was appointed by the Office of the United States Trustee to represent the interests of the Debtors'

unsecured creditors pursuant to § 1102(a) of the Bankruptcy Code.

      D.      This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to

28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as

defined in 28 U.S.C. § 157(b)(2).

      E.      The Pre-Petition Lenders, the Debtors, and certain affiliates of the Debtors (to the

extent applicable), are parties to, or have an interest in, one or more of the following documents,

as amended, modified and/or supplemented from time to time (collectively the "Pre-Petition

Loan Documents")[2]: (i) Amended and Restated Secured Term Note issued on or about April 30,

2008, from Holdings and PPM to Valens U.S. in the principal amount of $845,823.08 (the

"Secured Term Note I"); (ii) Amended and Restated Secured Term Note, issued on or about

April 30, 2008, from Holdings and PPM to Valens Offshore I in the principal amount of

$3,737,511.90 (the "Secured Term Note II"); (iii) Secured Tranche B Term Note, issued on or

about April 30, 2008, from Holdings and PPM to Valens Offshore II in the principal amount of

$8.8 million (the "Secured Tranch B Term Note"); (iv) Amended and Restated Secured

Revolving Note (the "Revolving Note"), issued on or about April 30, 2008, from Holdings and

---

[2] Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the Pre-Petition Loan Documents.

PPM to Calliope in the amount of $3 million; (v) Secured Revolving Note, issued on or about April 30, 2008, from Heavens Knows Limited and Wright Machinery, Inc. in the amount of $3 million issued to Calliope;(vi) Amended and Restated Security Agreement dated April 30, 2008, among LV Administrative Services, Inc., as administrative and collateral agent, the Lenders from time to time a party thereto, Holdings, PPM and Foodtech, LLC (the "Amended and Restated Security Agreement"); (vii) Security Agreement dated April 30, 2008, among LV Administrative Services, Inc., as administrative and collateral agent, the Lenders from time to time a party thereto, Heavens Knows Limited and Wright Machinery, Inc. (the "Security Agreement" and together with the Amended and Restated Security Agreement, the "Security Agreements";(viii) Stock Pledge Agreement dated as of July 30, 2007, between Holdings, as Pledgor and Calliope, as Pledgee; (ix) Stock Pledge Agreement dated as of July 30, 2007, between Holdings, as Pledgor and Calliope, as Pledgee, in respect of shares in Potato Processing Machinery AB; (x) Stock Pledge Agreement dated as of April 30, 2008, between Holdings, as Pledgor and LV Administrative Services, Inc., as administrative and collateral agent; (xi) Stock Pledge Agreement dated as of April 30, 2008, between Heavens Knows Limited and Wright Machinery, Inc., as Pledgor and LV Administrative Services, Inc., as administrative and collateral agent;(xii) Overadvance Side Letter dated as of June 30, 2009, among LV Administrative Services, Inc., as agent, Valens U.S., Valens Offshore I, Valens Offshore II, Holdings, PPM and PPM Management, LLC (f/k/a Foodtech, LLC); (xiii) Overadvance Side Letter dated as of June 30, 2009, among LV Administrative Services, Inc., as agent, Valens U.S., Heavens Knows Limited, Wright Machinery Limited and Wright Machinery, Inc.;(xiv) Amended and Restated Common Stock Purchase Warrant A, Issue Date July 30, 2007, Amended and Restated Date as of April 30, 2008, from Holdings to Calliope; (xv) Amended and Restated Common Stock Purchase Warrant

B, Issue Date July 30, 2007, Amended and Restated Date as of April 30, 2008, from Holdings to

Calliope; (xvi) Amended and Restated Common Stock Purchase Warrant C, Issue Date July 30,

2007, Amended and Restated Date as of April 30, 2008, from Holdings to Calliope; (xvii)

Amended and Restated Common Stock Purchase Warrant D, Issue Date January 29, 2008,

Amended and Restated Date as of April 30, 2008, from Holdings to Valens U.S.; (xviii)

Amended and Restated Common Stock Purchase Warrant E, Issue Date January 29, 2008,

Amended and Restated Date as of April 30, 2008, from Holdings to Valens Offshore I; (xix)

Common Stock Purchase Warrant F-1, Issue Date April 30, 2008, from Holdings to Calliope;

and (xx) Common Stock Purchase Warrant F-2, Issue Date April 30, 2008, from Holdings to

Valens Offshore II, together with all related and ancillary documents executed in connection

with the foregoing.

      F.      The Debtors admit and represent to this Court as affirmed at the Final Hearing,

and this Court finds, subject to the rights of the Committee and any other party in interest set

forth in paragraph 24 of this Order, that all obligations of the Debtors to the Pre-Petition Lenders

of any kind or nature under the Pre-Petition Loan Documents are secured by a first priority

blanket security interest (the "Pre-Petition Liens") in the "Collateral," which is defined in the

Security Agreements to include "all of each Company's property and assets, whether real or

personal, tangible or intangible and whether now owned or hereafter acquired …" and the

proceeds and products of all of the foregoing as more particularly described in the Pre-Petition

Loan Documents (all such Collateral is hereafter referred to as the "Pre-Petition Collateral").

The Pre-Petition Collateral includes "all Deposit Accounts, other bank accounts and all funds on

deposit therein," as well as "all money, cash and cash equivalents," of the Debtors.

43520/0070-6531568v4

G.    The Debtors admit and represent to this Court as affirmed at the Final Hearing,

and this Court finds, subject to the rights of the Committee and any other party in interest set

forth in paragraph 24 of this Order, that each of the Debtors is truly and justly indebted to the

Pre-Petition Lenders under those Pre-Petition Loan Documents to which the Debtors are a party

or obligor, without defense, counterclaim or offset of any kind, and that as of April 3, 2010, such

liability to the Pre-Petition Lenders was, including interest, fees and other charges (including

default fees and the acceleration/default payment), unpaid thereon in the aggregate amount of

approximately (but not less than) $15,005,232.48 (plus attorneys' fees, costs, expenses, and fees)

(the "Pre-Petition Indebtedness") and that no portion of the Pre-Petition Indebtedness is subject

to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or

applicable non-bankruptcy law.  As of the Petition Date, but subject to the rights of the

Committee and any other party in interest set forth in paragraph 24 of this Order, the Debtors in

consideration of the Post-Petition Financing to be made available under the terms of the Interim

Order and this Order, waive and release any and all causes of action and claims, defenses and

setoff rights against the Pre-Petition Lenders and their respective affiliates agents,

representatives, employees (including Scott Bluestein, Dhamendra Lachman and Fareesa

Yahaya), assigns and successors, including all claims asserted or which could have been asserted

by the Debtors in the action, *PPM Global Corporation, et al. v. LV Administrative Services, Inc.,

et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Case

No. 10-cv-01794.

H.    The Debtors admit and represent to this Court as affirmed at the Final Hearing,

and this Court finds, subject to the rights of the Committee and any other party in interest set

forth in paragraph 24 of this Order, that by reason of the Pre-Petition Loan Documents, (i) the

Pre-Petition Indebtedness is secured by valid, properly perfected, enforceable and non-avoidable liens and security interests granted by the Debtors to the Pre-Petition Lenders upon and in all of the Pre-Petition Collateral, (ii) the liens held by the Pre-Petition Lenders securing the Pre-Petition Indebtedness are senior to all other security interests in the Pre-Petition Collateral subject only to any Permitted Liens (as defined in paragraph 7(b) below) and (iii) the liens and security interests granted by the Debtors to the Pre-Petition Lenders upon and in all of the Pre-Petition Collateral are not subject to avoidance, recharacterization or subordination in any way.

I.      The Debtors are unable to operate by using only Cash Collateral and are unable to provide the Pre-Petition Lenders with adequate protection for the use of Cash Collateral. Moreover, the Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense. Financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in §§ 503(b) and 507(b) of the Bankruptcy Code and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to §§ 364(c) and 364(d) of the Bankruptcy Code.

J.      Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) the creditors holding the twenty (20) largest unsecured claims against the Debtors; and (iii) known holders of pre-petition liens against the Debtors' property. A copy of the Interim Order, which, among other things, set forth (1) the date by which objections to the entry of a "Final Order" (as defined in the Interim Order) were required to be filed, and (2) the scheduling of the Final Hearing, including the time, date and

**8**

place of the Final Hearing, was served upon those parties identified in the certificate of service

dated May 5, 2010 [Docket No. 114].

K.      Based upon the Motion, the Palmer Affidavit, and the record made at the

Preliminary Hearing, the Court approved the Interim Order.  Pursuant to the Interim Order and

Bankruptcy Rule 4001, the Debtors were authorized, among other things, to incur secured

borrowings from the DIP Lender pursuant to the terms of the DIP Loan Documents and the

Interim Order pending the Final Hearing on the Motion.  The Interim Order, including, without

limitation, any findings made therein, is incorporated herein by reference.  Pursuant to the

Interim Order, the Final Hearing was scheduled for May 21, 2010.

L.      Based on the record presented to this Court by the Debtors, it appears that the

Post-Petition Financing and the terms governing the use of Cash Collateral have been negotiated

in good faith and at arm's-length among the Debtors, including through the CRO, and the Pre-

Petition Lenders and the DIP Lender, and any credit extended and loans made to the Debtors by

the DIP Lender pursuant to the *Order Authorizing Debtors Interim Use of Cash Collateral,*

*entered April 16, 2010* [Docket No. 34] (the "Emergency Cash Collateral Order"), the Interim

Order and this Order shall be deemed to have been extended, issued or made, as the case may be,

in good faith as required by, and within the meaning of, Section 364(e) of the Bankruptcy Code

and the DIP Lender shall have all of the protections thereunder.

M.      Based on the record before this Court, it appears that the terms of this Order,

including, without limitation, the terms of the Post-Petition Financing and use of Cash Collateral,

are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent

with their fiduciary duties, and is supported by reasonably equivalent value and fair

consideration.

43520/0070-6531568v4

N.     This Court concludes that entry of this Order is in the best interests of the

Debtors' estates and creditors as its implementation will, among other things, allow for the flow

of goods, supplies and services to the Debtors necessary to sustain the Debtors' business

operations and enhance the Debtors' prospects for a successful asset sale and completion of the

Chapter 11 Cases.

Based upon the foregoing findings and conclusions and the Debtor Stipulations, and upon

the record made before this Court to date, including the record made before this Court at the

Preliminary Hearing and the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1.     <u>Motion Granted</u>.  The Motion is granted, on the terms and conditions set forth in

this Order, on a final basis.

2.     <u>Authorization</u>.  The Debtors are expressly authorized and empowered, on a final

basis, to (a) whether or not within the "Formula Amount," as that term is defined in the

Amended And Restated Security Agreement, obtain the Post-Petition Financing, use Cash

Collateral, and perform all obligations strictly pursuant to the provisions of this Order; (b)

perform all obligations under the Pre-Petition Loan Documents as such documents are, or may

be, amended and modified pursuant to the terms of this Order, other than (i) any obligations to

make any prepayments except as otherwise required by this Order, (ii) any obligation to pay any

overadvance interest, as that term is defined in Section 5(b)(ii) of the Amended And Restated

Security Agreement (the "<u>Overadvance Fees</u>") or any "Default Payments," as that term is

defined in the Pre-Petition Documents (collectively, the "<u>Default Payments</u>"), without waiving

the rights of the Pre-Petition Lenders to subsequently recover thereupon; or (iii) any obligation to

comply with the reporting requirements contained in Section 11 of the Amended And Restated

Security Agreement or the financial covenants contained in Section 13(x) of the Amended And

Restated Security Agreement, which reporting requirements are superseded by the provisions of

this Order; and (c) enter into such other agreements, instruments and documents as may be

necessary or required to evidence the obligations to the DIP Lender and the Pre-Petition Lenders,

to consummate the terms and provisions of the Motion, the Interim Order and this Order and to

evidence perfection of the liens and security interests to be given to the DIP Lender and the Pre-

Petition Lenders in this Order (the Pre-Petition Loan Documents as modified by this Order shall

hereinafter be referred to as the "DIP Loan Documents").  The DIP Lender's advances of the

Post-Petition Financing shall be pursuant to the same terms as the Pre-Petition Loan Documents,

as modified by this Order, without the need for further execution or documentation, and all

advances by the DIP Lender shall be deemed made consistent with the terms of the Revolving

Note and limited by the Security Agreements.  The borrowing(s) made on or after the Petition

Date under the credit facility maintained under the DIP Loan Documents (the "DIP Facility")

and all other indebtedness and obligations incurred on or after the Petition Date with respect to

loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to the

Interim Order, this Order and the DIP Loan Documents which may now or from time to time

hereafter be owing by the Debtors to the DIP Lender (including principal, accrued and unpaid

interest, and fees costs and expenses, including without limitation attorneys' fees and expenses)

are referred to herein as the "DIP Indebtedness," and, together with the Pre-Petition

Indebtedness, as the "Indebtedness."  The Debtors and the DIP Lender may enter into

nonmaterial amendments of or modifications to the DIP Loan Documents without the need of

further notice and hearing or order of this Court.

3.       Borrowing; Use Cash Collateral and Continuation of the Debtors' Accounts.

Subject to any Approved Budget (as defined in paragraph 17 below) and solely in compliance

therewith and subject further to the terms and conditions of this Order and the DIP Loan

Documents, (a) the Pre-Petition Lenders hereby consent to the Debtors' limited use of Cash

Collateral, and (b) the DIP Lender will provide the DIP Facility, on a revolving basis, in

accordance with the terms of the DIP Loan Documents, provided, however, that the Debtors may

be permitted an overadvance, as applicable, under the DIP Loan Documents in the amounts set

forth in an Approved Budget.  The Debtors may continue to use their pre-Petition Date bank

accounts and cash management system, including the requirement that all collections be remitted

to the lockbox in accordance with the Pre-Petition Loan Documents, and the DIP Lender shall be

deemed a party to the pre-petition lock box arrangements between the Debtors and the Pre-

Petition Lenders; *provided that* the Debtors and DIP Lender may agree that the Debtors shall

open new bank accounts and establish a new cash management system so long as such bank

accounts and cash management system comply with the requirements established by the Office

of the United States Trustee, unless otherwise ordered by the Court.

4.       Application of Proceeds.

(a)       Subject to the rights of the Committee and any other party in interest set

forth in paragraph 24 of this Order, proceeds or payments received by the Pre-Petition Lenders

and/or the DIP Lender with respect to the Pre-Petition Collateral and DIP Facility Collateral (as

defined in paragraph 7 below) shall be applied as follows: (i) first, to the Pre-Petition

Indebtedness consisting of accrued and accruing interest, fees, costs and expenses; (ii) next, to

the Pre-Petition Indebtedness consisting of principal; and (iii) next, to the outstanding balance of

the DIP Facility, the first of which to all accrued and accruing interest, fees, costs and expenses, and then to principal.

(b)    The automatic stay under Section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the Pre-Petition Lenders to retrieve, collect and apply payments and proceeds in respect of the Pre-Petition Collateral and the DIP Facility Collateral (defined in paragraph 7 below) in accordance with the terms and provisions of this Order and the DIP Loan Documents.

(c)    Subject to the rights of the Committee and any other party in interest set forth in paragraph 24 of this Order, neither the Debtors nor any other party, including the CRO, shall have the right to direct or seek an order directing the manner of application of any payments to the DIP Lender or the Pre-Petition Lenders or any other receipts by the DIP Lender or the Pre-Petition Lenders of proceeds of any of the Pre-Petition Collateral or DIP Facility Collateral (defined in paragraph 7 below) other than in the manner set forth in this Order and the Pre-Petition Loan Documents and the DIP Loan Documents.

5.    Interest, Fees, Costs and Expenses.  Subject to (a) Sections 3.2 and 4.10 of the Secured Term Note I, (b) Sections 3.2 and 4.10 of the Secured Term Note II, (c) Sections 3.2 and 4.10 of the Secured Tranche B Term Note; and (d) Sections 2.2 and 3.10 of the Revolving Note, as applicable, the Pre-Petition Indebtedness shall bear interest from and after the Petition Date at the applicable Contract Rate (as defined in and set forth in Section 1.1 of the respective Notes). The DIP Indebtedness shall bear interest at the non-default rate set forth in the Pre-Petition Loan Documents.  The DIP Lender and the Pre-Petition Lenders shall be entitled to recover all of their reasonable attorneys' fees and other professional fees as well as all costs and expenses incurred in connection with the Indebtedness and this proceeding, other than any Overadvance Fees or

any Default Payments, without waiving the rights of the Pre-Petition Lenders to subsequently

recover thereupon.  In consideration for providing the DIP Facility, the DIP Lender shall be paid

all fees specified in the DIP Loan Documents in accordance with the terms therein for such

payment.

6.      Termination of the DIP Facility and Use of Cash Collateral.

(a)      The DIP Lender's agreement to provide the DIP Facility in accordance

with the DIP Loan Documents and the Pre-Petition Lenders' consent to the use of the Cash

Collateral shall immediately and automatically terminate (except as the DIP Lender and/or the

Pre-Petition Lenders may otherwise agree in writing in their sole discretion), and all

Indebtedness shall be immediately due and payable in cash upon the earliest to occur of any of

the following (each, a "Termination Event" and the date upon which a Termination Event occurs,

the "Termination Date"):

(1)      the date of final indefeasible payment and satisfaction in full in
cash of the Indebtedness;

(2)      the effective date of any confirmed plan in either of the Chapter 11
Cases;

(3)      the consummation of the sale or other disposition of all or
substantially all of the assets of either of the Debtors;

(4)      the occurrence of any breach by either of the Debtors of the
Interim Order or this Order (including, but not limited to, either
Debtors' failure to adhere to an Approved Budget as set forth in
ordering paragraph 17 of this Order or violation of any of the
covenants provided for in ordering paragraph 19 of this Order), or
under any of the DIP Loan Documents, except (a) any defaults that
may have existed under any Pre-Petition Loan Documents as of the
Petition Date, (b) any defaults under any of the Pre-Petition Loan
Documents to which Debtors are not parties, and (c) any defaults
arising under Amended And Restated Security Agreement Sections
19(c)(i), (d), (e)(i) with respect to Subsidiaries (as that term is
defined therein), (e)(ii), (g), (i), (j), (n) if otherwise excepted under
this Order, and (o) if otherwise excepted under this Order;

14

(5)    the dismissal of either of the Chapter 11 Cases or the conversion of either of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;

(6)    the CRO is removed or his appointment is not approved on a final basis;

(7)    upon and following the entry of an order authorizing the appointment in either of the Debtors' Chapter 11 Cases of a trustee or an examiner with enlarged powers (beyond those set forth in § 1106(a)(3) and (4) of the Bankruptcy Code), relating to the operation of the business of the Debtors without the prior written consent of the DIP Lender (which consent may be withheld, or, if given revoked, by the DIP Lender in its sole discretion), or if either of the Debtors applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion);

(8)    the Emergency Cash Collateral Order, the Interim Order or this Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion);

(9)    the Court enters an order granting a party relief from the automatic stay with respect to any portion of the Pre-Petition Collateral or the DIP Facility Collateral (defined in paragraph 7 below) provided that the value of the relevant collateral is more than $15,000;

(10)   any party asserts a challenge to, or this or any other Court enters an order or judgment in either of the Chapter 11 Cases modifying, limiting, subordinating or avoiding the priority of the Indebtedness, or the perfection, priority or validity of the Pre-Petition Lenders' or the DIP Lender's Pre-Petition or DIP Facility Liens or imposing, surcharging or assessing against the Pre-Petition Lenders, the DIP Lender or their claims or any Pre-Petition Collateral or DIP Facility Collateral (defined in paragraph 7 below), any fees, costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise;

(11)   The board(s) of either of the Debtors are reconstituted without prior notice and consent of the DIP Lender;

(12)   subject to the Court's calendar, the failure of the Debtors to obtain an order from the Court establishing procedures relating to the conducting of an auction in connection with the sale of substantially all of the Debtors' assets ("Asset Sale") which procedures are acceptable to the Pre-Petition Lenders and the DIP

15

Lender and permit the Pre-Petition Lenders and the DIP Lender to credit bid the Pre-Petition Indebtedness and the DIP Indebtedness without condition (the "Asset Sale Procedures") by May 13, 2010 (or such later date as the DIP Lender shall agree in writing);

(13)   if the Debtors have not entered into an agreement for the Asset Sale on terms and conditions which are acceptable to the DIP Lender by May 24, 2010 (or such later date as the DIP Lender shall agree in writing;

(14)   subject to the Court's calendar, the failure of the Debtors to obtain an order from the Court approving the Asset Sale in a form acceptable to the Pre-Petition Lenders and the DIP Lender (the "Sale Order") by June 24, 2010 (or such later date as the DIP Lender shall agree in writing);

(15)   if the Asset Sale acceptable to the Pre-Petition Lenders and the DIP Lender has not closed by July 9, 2010 (or such later date as the DIP Lender shall agree in writing);

(16)   if the Debtors or CRO do not cooperate in the disclosure of information reasonably requested by the Pre-Petition Lenders, the DIP Lender or by any consultant retained by either the Pre-Petition Lenders or the DIP Lender;

(17)   the Debtors' or CRO's failure to comply with its reporting obligations under paragraph 18 of this Order; or

(18)   the resignation or termination of any member of the Debtors' senior management without the DIP Lender's written consent and retention of a replacement acceptable to the DIP Lender, which consent shall not be unreasonably withheld.

7.     Liens to Secure the DIP Indebtedness.  As security for the DIP Indebtedness, the DIP Lender is hereby granted the following security interests and liens (the "DIP Facility Liens") in all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, all cash, goods, accounts receivable, inventory, cash in advance deposits, general intangibles, goodwill, investment property (including, without limitation, ownership

interests in corporations, partnerships, and limited liability companies), deposit accounts, real

estate, intellectual property, machinery, leases and leasehold interests, fixtures, equipment,

vehicles, trademarks, trade names, licenses, the Pre-Petition Collateral, causes of action,

including, actions for preferences, fraudulent conveyances, and other avoidance power claims

and, subject to paragraph 7(e) below, any recoveries under §§ 542, 544, 545, 547, 548, 549, 550

and 553 of the Bankruptcy Code, other than any such claims or recoveries against or from the

Pre-Petition Lenders (collectively, "Avoidance Actions"), and, upon entry hereof, actions and

recoveries thereon against third parties, tax refund claims, commercial tort claims and insurance

proceeds, and the proceeds, products, rents and profits of all of the foregoing (all of the

foregoing, the "DIP Facility Collateral"), subject only to, in the event of the termination of the

DIP Facility and the payment of the Carve-Out (as defined in paragraph 15):

   (a) Pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first

priority senior security interest in and lien upon all property of the Debtors, whether existing on

the Petition Date or thereafter acquired, that, as of the Petition Date, is not subject to valid,

perfected and non-avoidable liens;

   (b) Pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected security

interest in and lien upon all property of the Debtors, including the DIP Facility Collateral,

whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected and

unavoidable liens in existence as of the Petition Date, which liens are senior to those of the Pre-

Petition Lenders under applicable non-bankruptcy law (the "Permitted Liens");

   (c) Pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first

priority senior priming lien (the "Priming Liens") as to the Pre-Petition Lenders on all of the DIP

17

Facility Collateral, and the Pre-Petition Collateral, which shall be senior to all other security

interests and liens in property of the Debtors' estate except only Permitted Liens; and

(d)    In addition, except to the extent otherwise expressly set forth in this Order,

or in a written instrument, agreement or other document executed by the DIP Lender, and subject

to Paragraph 24 of this Order (i) neither the Pre-Petition Liens nor the DIP Facility Liens shall be

subject to subordination to any other liens, security interests or claims under Section 510 of the

Bankruptcy Code, or otherwise and (ii) any security interest or lien upon the Pre-Petition

Collateral or the DIP Facility Collateral which is avoided or otherwise preserved for the benefit

of the Debtors' estate under Section 551 or any other provision of the Bankruptcy Code shall be

subordinate to the Pre-Petition Liens, the DIP Facility Liens and the Adequate Protection Liens

(defined in paragraph 8 below).

(e)    The DIP Facility Liens and the Adequate Protection Liens shall not attach

to (i) the first $100,000.00 of the net proceeds from Avoidance Action recoveries under § 547 of

the Bankruptcy Code and (ii) 40% of the net proceeds from Avoidance Action recoveries under §

547 of the Bankruptcy Code in excess of $100,000.  For purposes of this subparagraph, "net

proceeds" shall mean those proceeds recovered on account of any Avoidance Action under § 547

of the Bankruptcy Code after payment on account of such allowed compensation and expenses of

any professional retained by the estates to pursue such Avoidance Actions under § 547 of the

Bankruptcy Code, including the filing fees for such Avoidance Actions commenced under § 547

of the Bankruptcy Code.

8.    Adequate Protection Liens.  As adequate protection of the Pre-Petition Lenders'

interests in the Pre-Petition Collateral, including use of the Cash Collateral, pursuant to §§ 361,

363 and 552(b) of the Bankruptcy Code, the Pre-Petition Lenders are hereby granted valid,

binding, enforceable and perfected additional and replacement liens (the "Adequate Protection

Liens") in all property of the Debtors' estate, including the DIP Facility Collateral, the

Avoidance Actions and, subject to paragraph 7(e) above, proceeds thereof to the extent of any

decrease in the value of the Pre-Petition Lenders' interests in the Pre-Petition Collateral

occurring subsequent to the Petition Date, with such decrease in value to include decreases

resulting from the Debtors' use (if any) of Cash Collateral, the depreciation, use, sale, loss,

decline in value or market price of the Pre-Petition Collateral, or otherwise. The Adequate

Protection Liens shall enjoy the same validity, priority and extent as the liens the Pre-Petition

Lenders held on the Petition Date. The Adequate Protection Liens are subject only to (a) the

Permitted Liens; (b) the Carve-Out (as defined in paragraph 15); and (c) the DIP Facility Liens.

9.      Section 507(b) Priority Administrative Claims. If, notwithstanding the provision

of the Adequate Protection Liens, such liens do not provide adequate protection of the Pre-

Petition Lenders' interests in the Pre-Petition Collateral, the Pre-Petition Lenders shall (a) have a

claim allowed under §§ 507(a)(2) and 507(b) of the Bankruptcy Code (the "507(b) Claim"), and,

except with respect to being subordinated to the Carve-Out, such 507(b) Claim shall be entitled

to priority over every other claim allowable under such § 507(a)(2); and (b) notwithstanding

anything herein to the contrary, be entitled to seek further adequate protection of their interests

and such further relief as is consistent therewith.

10.      Superpriority Claims. Subject to the Carve-Out described in ordering paragraph

15 below, all of the DIP Indebtedness shall have the highest administrative priority under §

364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of

administration of any kind, including those specified in, or ordered pursuant to, §§ 326, 330, 331,

503(b), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code or otherwise (whether

43520/0070-6531568v4

incurred in the Chapter 11 Cases or any successor case), and shall at all times be senior to the

rights of the Debtors, any successor trustee or estate representative in the Chapter 11 Cases or

any successor case (the "Superpriority Claims").  Nothing in this Order or any Approved Budget

(as defined in paragraph 17 below) shall constitute the consent by the DIP Lender or the Pre-

Petition Lenders to the imposition of any costs or expense of administration or other charge, fees,

liens, assessment or claim (including, without limitation, any amounts set forth in any Approved

Budget) against the DIP Lender or the Pre-Petition Lenders, their claims or collateral (including

the Pre-Petition Collateral and the DIP Facility Collateral) under § 506(c) of the Bankruptcy

Code or otherwise, all of which rights will be waived upon entry of this Order.

      11.    <u>Perfection of DIP Facility Liens and Adequate Protection Liens</u>.  The DIP Facility

Liens and the Adequate Protection Liens shall be, and they hereby are, deemed duly perfected

and recorded under all applicable federal or state or other laws as of the date hereof, and no

notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien

waivers or other third party consents or other act, shall be required to effect such perfection;

<u>provided, however</u>, that notwithstanding the provisions of § 362 of the Bankruptcy Code, (a) the

DIP Lender may, at its sole option, file or record or cause the Debtors to obtain any such

landlord or warehousemen lien waivers or other third party consents or execute, file or record, at

the Debtors' expense, any such UCC financing statements, notices of liens and security interests,

mortgages and other similar documents as the DIP Lender may require to perfect its security

interests on the DIP Facility Collateral, and (b) the DIP Lender may require the Debtors to

deliver to the DIP Lender any chattel paper, instruments or securities evidencing or constituting

any DIP Facility Collateral, and the Debtors are directed to cooperate and comply therewith.  If

the DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any

landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded

any such notices, financing statements, mortgages or other documents with respect to such

security interests and liens, or if the DIP Lender, in accordance with the DIP Loan Documents or

this Order, elects to take possession of any DIP Facility Collateral, all such landlord or

warehouse lien waivers or other third party consents, financing statements or similar documents

or taking possession shall be deemed to have been filed or recorded or taken in either of these

Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as

set forth herein.  The DIP Lender and the Pre-Petition Lenders may (in their sole discretion), but

shall not be required to, file a certified copy of this Order in any filing or recording office in any

county or other jurisdiction in which the Debtors have real or personal property and such filing

or recording shall be accepted and shall constitute further evidence of (c) the DIP Lender's

interest in the DIP Facility Collateral and (d) the Pre-Petition Lenders' interest in the Pre-Petition

Collateral.

12.    <u>Waiver by the Debtors of Liens and Other Matters</u>.  The Debtors and, subject to

paragraph 24 below, their estates and any party in interest acting on behalf of the Debtors, hereby

irrevocably waive, and are barred from asserting or exercising any right (a) without the Pre-

Petition Lenders' or the DIP Lender's prior written consent (which may be withheld in their sole

discretion) or (b) without prior indefeasible payment and satisfaction in full of all of the

Indebtedness: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the

Bankruptcy Code, or otherwise, liens on or security interests in any DIP Facility Collateral,

which are <u>pari passu</u> with or senior to the DIP Facility Liens or the Adequate Protection Liens;

(ii) to return goods pursuant to § 546(h) of the Bankruptcy Code to any creditor of the Debtors or

to consent to any creditor taking any setoff against any of such creditor's pre-petition

43520/0070-6531568v4

indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or

otherwise; (iii) to seek a surcharge of the DIP Facility Collateral or the Pre-Petition Collateral

under § 506(c) of the Bankruptcy Code; (iv) to modify or affect any of the rights of the Pre-

Petition Lenders or the DIP Lender under this Order or any DIP Loan Documents by any order

entered in either of the Chapter 11 Cases or any successor case; or (v) to propose or support any

plan of reorganization or liquidation or a sale of all or substantially all of the Debtors' assets or

entry of any confirmation order or sale order that is not conditioned upon the indefeasible

payment in full in cash, on or prior to the earlier to occur of the effective date of such plan of

reorganization or sale and the Termination Date, of all of the Indebtedness, or seek an extension

of the exclusive right to file a plan or solicit acceptances with respect to any plan of

reorganization or liquidation.

13.    Sale Out of the Ordinary Course of Business.  The Debtors may not propose a sale

of any of its assets outside the ordinary course of business without the DIP Lender's written

consent.  All proceeds realized from any Court-approved sale shall be transferred to the DIP

Lender and/or the Pre-Petition Lenders as their respective interests appear, for immediate

application in reduction of the Indebtedness (unless otherwise agreed to in writing by the Pre-

Petition Lenders and the DIP Lender), in the manner set forth in this Order and until such time as

the Indebtedness shall have been satisfied in full.  Such sale proceeds shall not be permitted to be

used by the Debtors under any circumstances except as otherwise provided by this Order, and

any sale application or procedure involving all or any portion of the Debtors' assets that are

subject to the Pre-Petition Liens of the Pre-Petition Lenders or the DIP Facility Liens shall

expressly provide that the Pre-Petition Lenders and the DIP Lender may exercise their rights to

credit bid their indebtedness, including under § 363(k) of the Bankruptcy Code, irrespective of

the pendency of any challenge to the Pre-Petition Lenders' or DIP Lender's liens, claims or

interests.

      14.    <u>Modification of Automatic Stay; Other Remedies.</u>

      (a)    Except as set forth in subparagraph (b) of this paragraph 14, which

governs any action of the Pre-Petition Lenders and/or the DIP Lender, as applicable, to foreclose

on their liens on any Pre-Petition Collateral or DIP Facility Collateral or to exercise any other

default-related remedies (other than those specifically referenced in paragraph 14(a)(iv)(x)-(z)

below), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to the

Pre-Petition Lenders and DIP Lender to permit them to perform in accordance with, and

exercise, enjoy and enforce their rights, benefits, privileges and remedies pursuant to this Order

and the DIP Loan Documents without further application or motion to, or order from, the Court,

and regardless of any change in circumstances (whether or not foreseeable), and neither Section

105 of the Bankruptcy Code, nor any other provision of the Bankruptcy Code, nor any other law,

shall be utilized to prohibit the Pre-Petition Lenders or the DIP Lender from the exercise,

enjoyment and enforcement of any of such rights, benefits, privileges and remedies. The Pre-

Petition Lenders and the DIP Lender are hereby granted leave to receive and apply payments to

the Indebtedness from collections on and proceeds of the Pre-Petition Collateral and the DIP

Facility Collateral in the manner specified in this Order and the DIP Loan Documents. In

addition, the Pre-Petition Lenders and the DIP Lender are, as their interests may appear, hereby

granted leave to, among other things, to (i) file or record any financing statements, mortgages or

other instruments or other documents to evidence the Adequate Protection Liens or the DIP

Facility Liens, (ii) to charge and collect any interest, fees (including reasonable attorneys' fees),

costs, and expenses and other amounts accruing at any time under the DIP Loan Documents

(other than the Overadvance Fees or the Default Payments, without waiving the rights of the Pre-

Petition Lenders to subsequently recover thereupon) or this Order as provided therein, (iii) to

give the Debtors any notice provided for in any of the DIP Loan Documents or this Order, and

(iv) upon the occurrence of a Termination Event, and without application or motion to, or order

from the Court or any other court, (x) terminate the DIP Facility and the DIP Loan Documents,

(y) declare all Indebtedness immediately due and payable, and (z) revoke the Debtors' rights, if

any, under this Order and/or the other DIP Loan Documents to use Cash Collateral.

      (b)    Upon the occurrence of a Termination Event or on any Termination Date,

the Pre-Petition Lenders and/or the DIP Lender, as the case may be, may request an expedited

hearing (the "Stay Relief Notice Period"), subject to the Court's availability, on notice to the

Debtors, counsel to the Debtors, counsel to the CRO, counsel to the Committee and the U.S.

Trustee, for a determination, subject to subparagraph (c) of this paragraph 14, on a motion to be

filed by the Pre-Petition Lenders and/or the DIP Lender (a "Termination Date Stay Relief

Motion") as to whether the Pre-Petition Lenders and/or the DIP Lender shall be granted an order

providing that the automatic stay under § 362 of the Bankruptcy Code shall be vacated and

modified with respect to the Pre-Petition Lenders and/or the DIP Lender for the purpose of

exercising all of their rights and remedies under the Pre-Petition Loan Documents, the DIP Loan

Documents, this Order or applicable law, including foreclosing or otherwise enforcing their liens

on any or all of the Pre-Petition Collateral and the DIP Facility Collateral, or to take any and all

actions and remedies which they deem appropriate to effectuate these rights and remedies.

Notwithstanding anything in this subparagraph to the contrary, the Debtors, the CRO and/or the

Committee shall be entitled to seek a hearing prior to the expiration of the Stay Relief Notice

Period, and the Pre-Petition Lenders and/or the DIP Lender, as the case may be, shall be entitled

to an immediate hearing in the event that either or both alleges fraud or other imminent danger to

any of the Pre-Petition Collateral or the DIP Facility Collateral.

    (c)  Unless the Debtors, the CRO, the Committee, the U.S. Trustee and/or any

other party in interest have filed an objection to any Termination Date Stay Relief Motion with

the Court and served same upon the Pre-Petition Lenders and the DIP Lender within the Stay

Relief Notice Period, the Pre-Petition Lenders and/or the DIP Lender, as applicable, shall be

entitled to file a certificate that no objection to a Termination Date Stay Relief Motion was filed

and the Court may enter an order granting the relief requested in a Termination Date Stay Relief

Motion without a hearing.  The Debtors, the CRO, the Committee or the U.S. Trustee, as the case

may be, shall have the burden of proof at any hearing with respect to a Termination Date Stay

Relief Motion and the only issue that may be raised or addressed at such hearing or in connection

with a Termination Date Stay Relief Motion is whether a Termination Event or the Termination

Date, as applicable, has occurred.  Subject to the Debtors' rights in the foregoing sentence, the

Debtors and the CRO shall cooperate with the Pre-Petition Lenders and/or the DIP Lender in

connection with any enforcement action by such parties by, among other things, (i) providing

access to their premises to representatives of the Pre-Petition Lenders and/or the DIP Lender, (ii)

providing the Pre-Petition Lenders and/or the DIP Lender or its designees access to the Debtors'

books and records, (iii) performing all other obligations set forth in this Order, the Pre-Petition

Loan Documents and/or the DIP Loan Documents, and (iv) taking reasonable steps to safeguard

and protect the Pre-Petition Collateral and the DIP Facility Collateral until the Pre-Petition

Lenders and/or the DIP Lender can make adequate provision to protect and safeguard the Pre-

Petition Collateral and the DIP Facility Collateral, and neither the Debtors nor the CRO shall

43520/0070-6531568v4

otherwise interfere or encourage others to interfere with any and all of the Pre-Petition Lenders'

and/or the DIP Lender's rights.

15.    Carve-Out.

(a)    Subject to the remaining provisions of this paragraph, all liens and claims

of the Pre-Petition Lenders or the DIP Lender, including, but not limited to the Adequate

Protection Liens, the DIP Facility Liens, the Superpriority Claims, and the 507(b) Claim shall be

subject to (i) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 (including,

without limitation, fees under 28 U.S.C. § 1930(a)(6)), (ii) the fees due to the Clerk of the Court,

(iii) the aggregate of actual fees and expenses incurred by the CRO and any professionals, for the

period prior to the occurrence of the Termination Date, provided such professionals were

retained by the Debtors, the CRO, or the Committee and that a line item exists on an Approved

Budget for such specific professionals (the "Professionals"), for the period beginning on the

Petition Date and ending on the Termination Date, to the extent that (x) such fees and expenses

are within the aggregate of the weekly amounts set forth in an Approved Budget for the period

beginning on the Petition Date and ending on the occurrence of the Termination Date, and (y)

with respect to the Professionals, such fees and expenses are allowed at any time, whether

before, on, or after the Termination Date by the Bankruptcy Court under Sections 330 and 331 of

the Bankruptcy Code, and (iv) the payment, following the occurrence of any Termination Event

which is not waived by the DIP Lender, of allowed professional fees and disbursements incurred

after notice of such Termination Date by the CRO and the Professionals, in an aggregate amount

not to exceed $25,000 (the "Burial Carve-Out," and, collectively with the fees and expenses

referenced in (i), (ii) and (iii) of this paragraph 15(a), the "Carve-Out"); provided that such

amounts are (y) not otherwise payable from unencumbered assets of the Debtors' estate and (z)

with respect to the Burial Carve-Out only, not otherwise payable from any unused portion of amounts set forth in an Approved Budget for the period prior to the Termination Date.

(b)    Notwithstanding anything to the contrary in the Interim Order, this Order or the DIP Loan Documents, no proceeds of any Pre-Petition Collateral or DIP Facility Collateral of the Pre-Petition Lenders (including any pre-petition retainer funded by the Pre-Petition Lenders), nor any Pre-Petition Collateral of the Pre-Petition Lenders or DIP Facility Collateral (or proceeds thereof) nor any portion of the Carve-Out may be used to pay any claims for services rendered by any of the Debtors' or CRO's professionals, any other entity, or the Committee's professionals in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief (i) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Indebtedness or the liens and security interests of the Pre-Petition Lenders or the DIP Lender in the Pre-Petition Collateral or in the DIP Facility Collateral; (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Pre-Petition Lenders or the DIP Lender of any of their rights and remedies under the Pre-Petition Loan Documents, the Interim Order, this Order and/or the DIP Loan Documents or the Pre-Petition Lenders' or the DIP Lender's enforcement or realization upon any of the liens on or security interests in any Pre-Petition Collateral or DIP Facility Collateral; (iii) requesting the use of the Cash Collateral without the prior written consent of the Pre-Petition Lenders in accordance with the terms and conditions of this Order, (iv) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to § 364(c) or § 364(d) of the Bankruptcy Code, other than from the Pre-Petition Lenders or the DIP Lender,

27

without the prior written consent of the Pre-Petition Lenders and the DIP Lender, (v) the

commencement or prosecution of any action or proceeding of any claims, causes of action or

defenses against the Pre-Petition Lenders or the DIP Lender or any of their respective officers,

directors, employees, agents, attorneys, affiliates, successors or assigns, including, without

limitation, any attempt to recover or avoid any claim or interest from the Pre-Petition Lenders or

the DIP Lender under Chapter 5 of the Bankruptcy Code, or (vi) any act which has or could have

the effect of materially and adversely modifying or compromising the rights and remedies of the

Pre-Petition Lenders or the DIP Lender, or which is contrary, in a manner that is material and

adverse to the Pre-Petition Lenders or the DIP Lender, to any term or condition set forth in or

acknowledged by the DIP Loan Documents, the Pre-Petition Loan Documents or this Order;

provided, however, that the foregoing limitations shall not apply to claims (1) to contest whether

a Termination Event has occurred and (2) for services rendered (a) during the Debtors' Review

Period (as defined in the Interim Order) by the Professionals retained by the Debtors and (b) by

Professionals retained by the Committee within the time provided in Paragraph 24 of this Order

in connection with the investigation of the validity, extent, priority, avoidability or enforceability

of the Pre-Petition Indebtedness or the Pre-Petition Liens of the Pre-Petition Lenders.  The Pre-

Petition Lenders and the DIP Lender shall retain their rights as parties in interest to object to any

fee applications or other claims of any entity, including but not limited to the professionals for

the Debtors, the CRO and the Committee.

        (c)     So long as no Termination Event has occurred as to which notice of same

has been provided to the Debtors, the Debtors are authorized to use the proceeds of the DIP

Facility and the Cash Collateral in accordance with and limited to the amounts in the Approved

Budget to pay such compensation and expense reimbursements of the CRO, professional persons

retained by the CRO on behalf of the Debtors (the "Debtor Professionals"), and the Committee

(the "Committee Professionals") as may be awarded by the Court pursuant to Section 328, 330 or

331 of the Bankruptcy Code (the "Professional Expenses"). The Debtor Professionals and the

Committee Professionals shall be permitted to submit to the Debtors, with copies to counsel for

the DIP Lender, periodic statements (but no more frequently than on a monthly basis) for

services rendered and reimbursable expenses incurred by them (the "Conditional Professional

Expenses"). Nothing in this subparagraph shall prejudice or impair the rights of either the CRO

or the Professionals to request an award of compensation in excess of the amounts set forth in the

Approved Budget (the "Unbudgeted Professional Expenses") or the rights of the DIP Lender or

the Pre-Petition Lenders to object to the amount or reasonableness of the expenses of the CRO,

the Debtors' professionals or the Committee professionals, including the Conditional

Professional Expenses or the Unbudgeted Professional Expenses. In no event, however, shall (i)

the Pre-Petition Lenders or the DIP Lender be responsible for the payment of any professional

expenses other than the Carve-Out, or (ii) the proceeds of the DIP Facility, the DIP Facility

Collateral, the Pre-Petition Collateral or the Cash Collateral be utilized for Unbudgeted

Professional Expenses or any amounts in excess of the amounts in an Approved Budget and

Carve-Out, other than the Burial Carve-Out, unless and until the DIP Lender and Pre-Petition

Lenders are paid in full.

16.    Cash Collection Procedures. Consistent with the Interim Order, and including

from and after the date of the entry of this Order, all collections and proceeds of any DIP Facility

Collateral which shall at any time come into the possession or control of the Debtors, or to which

the Debtors shall become entitled at any time, shall be deposited in the same bank accounts into

which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-

Petition Loan Documents (or in such other accounts as are designated by the Pre-Petition

Lenders and the DIP Lender from time to time), and such collections and proceeds upon such

deposit shall become the sole and exclusive property of the Pre-Petition Lenders or the DIP

Lender and shall be applied against the Indebtedness as provided in this Order and the DIP Loan

Documents.  In the event the Debtors intend to open any new bank accounts that would affect the

right and ability of the Pre-Petition Lenders and the DIP Lender to receive any proceeds as

contemplated by the Interim Order or this Order, the Debtors shall first obtain a "lock box

agreement" or other written confirmation to the satisfaction of the Pre-Petition Lenders and the

DIP Lender from the relevant banking institution recognizing the rights of the Pre-Petition

Lenders and the DIP Lender as provided for in this Order.  All cash and cash equivalents of the

Debtors currently in any account of the Debtors or otherwise in the possession or control of the

Debtors constitute proceeds of the Pre-Petition Collateral and shall be immediately remitted to

the Pre-Petition Lenders for application against the Indebtedness.  All financial institutions in

which any lockboxes, blocked accounts or other accounts of the Debtors are located are hereby

authorized and directed to comply with any request of the Pre-Petition Lenders and the DIP

Lender to turnover to the Pre-Petition Lenders and the DIP Lender all funds therein without

offset or deduction of any kind.

17.    Budget; Use of Cash Collateral and DIP Facility Proceeds.

(a)    Attached as Exhibit A hereto and incorporated herein by reference is a

budget (which has been approved by the DIP Lender) setting forth by line item all projected cash

receipts, sales and cash disbursements for the time period from April 22, 2010, through July 9,

2010 (the "Initial Approved Budget").  The Initial Approved Budget may be modified or

supplemented from time to time by additional budgets (covering any time period covered by a

30

prior budget or covering additional time periods) to which the Pre-Petition Lenders and the DIP

Lender agree in their sole discretion (each such additional budget, a "Supplemental Approved

Budget"), so long as such modification or supplement does not alter the amount of the

Professional Fee Expenses set forth on any Approved Budget without the consent of the Debtor

Professionals and Committee Professionals. The aggregate of all items approved by the DIP

Lender and the Pre-Petition Lenders in the Initial Approved Budget and any and all

Supplemental Approved Budget (acceptable to the Pre-Petition Lenders and the DIP Lender in

their sole discretion) shall constitute an "Approved Budget."

      (b)     The Debtors may use Cash Collateral and the proceeds of the DIP Facility

exclusively to pay for the expenses incurred by the Debtors as provided for in the Approved

Budget and the Burial Carve-Out. The Debtors represent and warrant that (i) the expenditures

set forth in the Approved Budget constitute all of the Debtors' projected expenses during the

period of the Approved Budget, and (ii) the Cash Collateral and the sums to be advanced by the

DIP Lender pursuant to the DIP Facility are sufficient to pay all of the expenses set forth in the

Approved Budget. The Debtors' disbursements shall not exceed those set forth in the Approved

Budget, in all cases subject to the Approved Sales Variance, the Approved Cash Receipts

Variance, and the Approved Disbursements Variance (all as defined below, collectively referred

to as the "Approved Variances"). Notwithstanding the foregoing, the DIP Lender shall have no

obligation to provide the DIP Facility if the Debtors exceed the disbursement amounts provided

in an Approved Budget. As used herein, the Approved Variances include, and are defined and

calculated as follows:

      (1)     "Approved Sales Variance" means a negative variance of less than
7%, between the Debtors' actual sales and the Debtors' projected
sales measured (a) commencing at the end of the second week
covered by the Approved Budget and each week thereafter, and (b)

cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

(2)    "Approved Cash Receipts Variance" means a negative variance of less than 7%, between the Debtors' actual cash receipts and the Debtors' projected cash receipts measured (a) on a weekly basis commencing with the end of the second week covered by the Approved Budget and each week thereafter, and (b) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated;

(3)    "Approved Disbursements Variance" means a positive variance of less than 4% of the Debtors' actual disbursements and the Debtors' projected disbursements, on a cumulative basis, each measured (a) on a weekly basis commencing with the end of the second week covered by the Approved Budget and each week thereafter, and (b) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated.

18.    Financial Reporting. Notwithstanding anything to the contrary contained in this Order, the Debtors shall not be required to comply with Section 11 of the Amended And Restated Security Agreement during the pendency of the Chapter 11 Cases. However, the Debtors shall provide the following reports to the DIP Lender:  (a) no later than 5:00 p.m. (prevailing Eastern Time) each business day, a written report setting forth the previous day's disbursements and collections; (b) no later than 5:00 p.m. (prevailing Eastern time) each Wednesday, a comparison of the items in the Budget for the preceding week to the Debtors' actual performance that includes a narrative summary of any material variances from the Budget for the preceding week; (c) no later than 5:00 p.m. (prevailing Eastern time) each Wednesday, a detailed report from any investment banker retained by the CRO that summarizes the status of the Debtors' efforts to sell substantially all of its assets as a going concern, which report shall include (i) a tracking chart reflecting what communications, if any, the investment banker had with interested parties during the prior week; (ii) copies of expressions of interest or letters of

intent received by the Debtors from third parties; (iii) a summary of the due diligence activities

conducted by interested parties in the preceding week; and (iv) a time table for execution of

definitive agreements with potential parties and the filing of pleadings with the Court seeking

approval of the sale; and (d) no later than the 10th day of each month, beginning May 10, 2010,

the Debtors' financial statements (including detail by operating division and consolidated

balance sheets, income statements and cash flow statements) for the immediately preceding

month in the same format as the Debtors have been providing, or were required to provide, to the

Pre-Petition Lenders prior to the Petition Date, (e) no later than the third (3rd) business day prior

to any request for funding under this Order, a detailed list of the disbursements to be paid with

such requested funding, together with such other detail as may be requested by the DIP Lender,

and (f) any other reports requested by the DIP Lender.

19.    [Intentionally Deleted]

20.    <u>The DIP Lender and the Pre-Petition Lenders Reservation of Rights</u>. The DIP

Lender and the Pre-Petition Lenders do not waive, and expressly reserve, any and all claims,

defenses, rights and remedies they have pursuant to any or all of the Pre-Petition Loan

Documents, the DIP Loan Documents, the Bankruptcy Code and/or other applicable law against

the Debtors and any officer, director, employee, agent or other representative of the Debtors.  In

addition, the rights and obligations of the Debtors and the rights, claims, liens, security interests

and priorities of the DIP Lender and the Pre-Petition Lenders arising under this Order are in

addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims,

liens, security interests and priorities granted by the Debtors, in its pre-petition capacity, under

the Pre-Petition Loan Documents.

21.    <u>Order Binding on Successors</u>. The provisions of this Order shall be binding upon

and inure to the benefit of the DIP Lender, the Pre-Petition Lenders, the Debtors and the CRO

and their respective successors and assigns (including any trustee or other estate representative

appointed as a representative of the Debtors' estate or of any estate in any successor case). No

third parties are intended to be or shall be deemed to be third party beneficiaries of this Order or

the DIP Loan Documents.

22.    <u>Releases and Validation of Pre-Petition Indebtedness and Pre-Petition Liens;</u>

<u>Allowance of Pre-Petition Indebtedness as Fully Secured Claim</u>. The release, discharge, waivers

and agreements set forth in this ordering paragraph will be deemed effective upon the entry of

this Order, subject only to the rights of the Committee and any other party in interest (other than

the Debtors or the CRO), as set forth in paragraph 24 below. Subject to the rights of the

Committee and any party in interest solely in accordance with paragraph 24 of this Order, the

Debtors (including the CRO on behalf of the Debtors) and their estates, hereby: (a) release and

discharge the Pre-Petition Lenders and the DIP Lender together with all of their affiliates, agents,

attorneys, officers, directors and employees from any and all claims and causes of action arising

out of, based upon or related to, in whole or in part, any of the Pre-Petition Loan Documents, any

aspect of the pre-petition relationship between the Pre-Petition Lenders and the Debtors, or any

other acts or omissions by the Pre-Petition Lenders in connection with any of the Pre-Petition

Loan Documents, or the Pre-Petition Lenders' pre-petition relationship with the Debtor, or

otherwise; (b) waive any and all claims, defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability,

subordination and avoidability (under §§ 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the

Bankruptcy Code or otherwise) of the Pre-Petition Indebtedness and the security interests in and

liens on the Pre-Petition Collateral in favor of the Pre-Petition Lenders; and (c) agree, without

further Court order and without the need for the filing of any proof of claim, to the allowance of

the pre-petition claims of the Pre-Petition Lenders pursuant to §§ 502 and 506 of the Bankruptcy

Code on account of the Pre-Petition Indebtedness totaling no less than $15,005,232.48 as of the

Petition Date, as fully secured claims.

23.    [Intentionally Deleted]

24.    <u>Objections by Parties in Interest</u>.  Upon the entry of this Order, all of the

provisions of this Order shall be final and binding on the Debtors (including, without limitation,

its successors and assigns), the CRO, the Debtors' shareholders, the Committee, and all creditors

and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed,

except that the Committee and any other party in interest (other than the Debtors or the CRO)

shall have through and including June 14, 2010 to file, on behalf of the Debtors, and to serve

upon counsel for the Pre-Petition Lenders and the DIP Lender, objections or complaints

respecting the claims, causes of actions and defenses released by the Debtors pursuant to

ordering paragraph 22 above or the validity, extent, priority, avoidability, or enforceability of the

Pre-Petition Indebtedness and the Pre-Petition Liens in the Pre-Petition Collateral, including

seeking to subordinate any liens or claims of the Pre-Petition Lenders under Section 510 of the

Bankruptcy Code, or otherwise (including, without limitation, the provisions of paragraphs E, F,

G, 12 and 22 above).  The Committee shall be deemed to have standing to file and prosecute the

claims and causes of action set forth in the preceding sentence, and neither the Pre-Petition

Lenders, the DIP Lender nor the Debtors shall seek to have such claims dismissed on standing

grounds; provided, however, that the foregoing shall not limit or prejudice the Pre-Petition

Lenders or DIP Lender's ability to defend or seek dismissal of such claims on any other grounds.

43520/0070-6531568v4

In the event that no objections or complaints are filed with this Court by the Committee or other party in interest (other than the Debtors or the CRO) and served upon counsel for the Pre-Petition Lenders and the DIP Lender within the time period set forth above, all of the provisions of this Order including, without limitation, paragraphs 12 and 22 and the Debtor Stipulations in this Order shall become final and binding for all purposes and upon all parties. The Court reserves jurisdiction to extend the foregoing deadlines if requests to do so are filed within the deadlines prescribed in this paragraph and supported by a motion for good cause on notice, or if the Committee, the Pre-Petition Lenders, the DIP Lender and the Debtors agree in writing to such an extension.

25.   Effect of Modification of Order. The Debtors shall not, without the DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Order or any DIP Loan Documents. If any of the provisions of this Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Order, and the Pre-Petition Lenders and the DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

26.   Safe Harbor. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the

Debtors to obtain credit on the terms and conditions upon which the Debtors and the DIP Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

27.     <u>Objections Overruled or Withdrawn</u>. All objections to the Motion or to entry of this Order have been withdrawn or are hereby overruled.

28.     <u>Controlling Effect of Order</u>. To the extent any provisions in this Order conflict with any provisions of the Motion, the Interim Order, the Emergency Cash Collateral Order, any Pre-Petition Loan Document, or any DIP Loan Document, the provisions of this Order shall control.

29.     <u>Order Effective</u>. This Order shall constitute findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules, shall be effective as of the date of signature by the Court or "so ordered" ruling from the bench; <u>provided</u>, <u>however</u>, that (a) any use of Cash Collateral by the Debtors from and after the Petition Date, including the CRO's use of approximately $98,000 on or about April 23, 2010, to which the Pre-Petition Lenders have consented, shall be entitled to the provisions and protections set forth in this Order *nunc pro tunc* to the date of such use and (b) the DIP Lender and the Pre-Petition Lenders shall be afforded all of the protections set forth in this Order, *nunc pro tunc* to the entry of the Interim Order, including, without limitation, the DIP Facility Liens and the Adequate Protection Liens, for any borrowings pursuant to the terms of the DIP Loan Documents and the Interim Order pending the Final Hearing.

30.     <u>Binding Nature of the CRO Appointment Orders</u>. Nothing herein is intended to alter the provisions set forth in the CRO Appointment Order and the Final CRO Appointment

43520/0070-6531568v4

Order, which shall be enforceable in all respects. To the extent any provisions in this Order

conflict with any provisions of the CRO Appointment Order or the Final CRO Appointment

Order, the CRO Appointment Order and the Final CRO Appointment Order shall control. All

references to a "Debtor" or the "Debtors" herein shall be deemed to refer to the CRO in his

capacity as CRO of the Debtors whether or not expressly stated.

31.     Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce

this Order according to its terms.

32.     Non Waiver. No omission or delay by the Pre-Petition Lenders or the DIP Lender

in exercising any right or powers under this Order (or the Interim Order, to the extent not

inconsistent with this Order), the Pre-Petition Loan Documents or DIP Loan Documents, or any

related agreement, will impair such right or power or be construed to be a waiver of any default

or breach or an acquiescence therein, and any single or partial exercise of any such right or

power will not preclude other or further exercise thereof or the exercise of any other right, and no

waiver will be valid unless in writing and signed by all the Pre-Petition Lenders or the DIP

Lender and then only to the extent specified.

33.     Resolution of Shearer's Foods, Inc.'s Objection. Shearer's Foods, Inc., the

Prepetition Lenders and the DIP Lender reserve all rights, claims and defenses relating to

whether the "Equipment" (as that term is defined in the *Limited Objection of Shearer's Foods,

Inc. to Debtors' Motion for Authority to Use Cash Collateral* [Docket No. 65]) is property of the

Debtors' estates pursuant to 11 U.S.C. § 541. To the extent it is ultimately determined by a

Court of competent jurisdiction that such Equipment is not property of the Debtors' estates, the

Pre-Petition Lender and the DIP Lender agree that (i) the liens and security interests granted to

the Pre-Petition Lender or the DIP Lender (pursuant to the Pre-Petition Loan Documents, this

Order or otherwise) shall not extend, attach or otherwise apply to the Equipment and (ii) the

Equipment shall not be included within the definition of Pre-Petition Collateral or DIP Facility

Collateral.

Dated: May 21 2K, 2010

Honorable Jack B. Schmetterer
United States Bankruptcy Judge

**MAY 21 2010**

43520/0070-6531568v4

PPM Technologies DIP Budget 5-20-10

| | 3 | Actual | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 14-May-10 | Actual | 21-May-10 | 28-May-10 | 04-Jun-10 | 11-Jun-10 | 18-Jun-10 | 25-Jun-10 | 02-Jul-10 | 09-Jul-10 |
| **Total Cash In** | 132,944 | 103,608 | 205,841 | 157,404 | 439,852 | 441,565 | 351,599 | 677,067 | 685,842 | 672,194 |
| **Cost of Sales** | | | | | | | | | | |
| Materials | 185,000 | 169,783 | 314,000 | 376,333 | 330,333 | 332,333 | 334,333 | 286,333 | 208,000 | 208,000 |
| Labor & Benefits | 0 | 4,067 | 57,576 | 87,619 | 52,689 | 0 | 57,575 | 61,302 | 95,218 | 0 |
| Purchased Parts & Ser | 0 | 27 | 42,655 | 30,000 | 41,462 | 0 | 60,548 | 42,328 | 77,243 | 50,000 |
| Freight Expense | 5,103 | 890 | 2,283 | 34,007 | 24,831 | 8,063 | 16,555 | 11,718 | 34,007 | 8,063 |
| Rent, Utilities & Supplies | 12,000 | 8,759 | 5,137 | 23,737 | 5,137 | 5,137 | 5,137 | 5,137 | 32,278 | 5,137 |
| **Total Cost of Sales** | 202,103 | 183,526 | 421,650 | 551,696 | 454,452 | 345,532 | 474,148 | 406,819 | 446,747 | 271,199 |
| **Selling Costs** | | | | | | | | | | |
| Salaries & Benefits | 31,587 | 2,429 | 8,461 | 41,208 | 8,461 | 4,017 | 40,049 | 41,208 | 8,461 | 0 |
| Commissions | 0 | 0 | 0 | 0 | 0 | 0 | 2,550 | 0 | 0 | 0 |
| Travel and Entertainment | 10,250 | 12,101 | 10,407 | 27,957 | 13,024 | 13,027 | 13,027 | 13,027 | 13,027 | 13,027 |
| Office Expenses | 181 | 5,081 | 6,158 | 5,095 | 10,000 | 1,000 | 6,158 | 5,095 | 0 | 0 |
| Other Selling Expense | 0 | 0 | 2,000 | 2,000 | 0 | 0 | 1,000 | 1,000 | 1,000 | 1,000 |
| **Total Selling Expense** | 42,018 | 19,611 | 27,026 | 76,260 | 31,485 | 18,044 | 62,783 | 60,330 | 22,488 | 14,027 |
| **G&A Expenses** | | | | | | | | | | |
| Salaries & Benefits | 1,850 | 40,519 | 4,588 | 66,056 | 57,868 | 1,500 | 4,588 | 66,056 | 4,588 | 54,780 |
| Office Expenses | 14,206 | 583 | 1,002 | 4,317 | 13,019 | 1,252 | 1,002 | 3,340 | 12,692 | 15,525 |
| Occupancy Expenses | 0 | 0 | 0 | 7,500 | 3,324 | 0 | 0 | 0 | 9,000 | 0 |
| Travel & Entertain | 1,500 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Insurance | 0 | 0 | 0 | 11,000 | 18,000 | 0 | 0 | 0 | 11,000 | 0 |
| Professional & Legal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other G&A Expense | 3,000 | 601 | 2,000 | 2,000 | 2,000 | 2,000 | 3,000 | 2,000 | 2,000 | 2,000 |
| **Total G&A Expense** | 20,556 | 41,702 | 9,090 | 92,373 | 95,710 | 6,252 | 10,090 | 72,896 | 40,780 | 73,805 |
| **Total Expenses** | 264,677 | 244,839 | 457,766 | 720,329 | 581,647 | 369,829 | 547,021 | 540,045 | 510,015 | 359,031 |
| **Cash Flow from Operations** | (131,733) | (141,231) | (251,925) | (562,925) | (141,795) | 71,736 | (195,422) | 137,022 | 175,827 | 313,163 |
| **Bankruptcy Expenses** | | | | | | | | | | |
| CRO Fees and Expenses | 27,000 | 0 | 30,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Greenberg Traurig/Committee Fees | 0 | 0 | 267,500 | 35,000 | 35,000 | 37,500 | 37,500 | 50,625 | 58,125 | 58,125 |
| US Trustees Fees | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 10,500 |
| Utility Deposit | 34,000 | 10,908 | 0 | 0 | 0 | 0 | 0 | 0 | 1,875 | 0 |
| Prepetition Employee Wages/Commissions | 85,000 | 87,357 | 54,800 | 0 | 247,313 | 0 | 0 | 0 | 0 | 0 |
| Purchase of Wright Machinery | 0 | 0 | 12,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swedish Legal Fees | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investment Banker Fees & Expenses | 0 | 0 | 0 | 20,000 | 4,000 | 0 | 0 | 30,000 | 0 | 28,000 |
| Other Bankruptcy Expense (Logan) | 0 | 0 | 0 | 5,000 | 5,000 | 2,000 | 2,000 | 15,000 | 5,000 | 5,000 |
| **Total Bankruptcy Expense** | 146,000 | 98,265 | 364,300 | 90,000 | 316,313 | 64,500 | 65,500 | 120,625 | 90,000 | 126,625 |
| **Total Cash Expenses** | 410,677 | 343,104 | 822,066 | 810,329 | 897,960 | 434,329 | 612,521 | 660,670 | 600,015 | 485,656 |
| **Net Weekly Cash Flow** | (277,733) | (239,496) | (616,225) | (652,925) | (458,108) | 7,236 | (260,922) | 16,397 | 85,827 | 186,538 |
| **Cumulative Net Cash Flow** | (666,192) | (602,646) | (1,218,871) | (1,871,796) | (2,329,904) | (2,322,668) | (2,583,590) | (2,567,192) | (2,481,365) | (2,294,827) |